STATE OF NORTH CAROLINA v. KAREN MARIE HESKETT HART

No. 9125SC445

(Filed 3 March 1992)

1. **Homicide § 295 (NCI4th); Robbery § 4.3 (NCI3d)— armed robbery—second degree murder of grandfather—acting in concert—sufficiency of evidence**

   Evidence was sufficient to support verdicts of guilty of armed robbery and second degree murder of defendant's grandfather where the evidence tended to show that defendant and a friend, pursuant to a common plan and scheme to rob defendant's grandfather, went to the grandfather's home; while defendant sat at the kitchen table exposing her breasts in order to distract the victim, the friend obtained a baseball bat, began beating the victim, and knocked him to the floor; the friend took the victim's wallet; and the friend and defendant then left the victim's residence and left the state.

   **Am Jur 2d, Homicide §§ 29, 425.**

2. **Criminal Law § 34 (NCI4th)— duress—acts subsequent to crime—evidence properly excluded**

   In a prosecution of defendant for armed robbery and second degree murder of her grandfather, the trial court did

STATE v. HART

[105 N.C. App. 542 (1992)]

not err in excluding testimony that defendant was not acting in concert with another person to commit the crimes and that defendant fled with the other person and remained with him under duress, since this testimony detailed events which took place after the murder in question and was not relevant to the determination of whether defendant was acting in concert.

**Am Jur 2d, Evidence § 278; Homicide § 119.**

3. **Attorneys at Law § 38 (NCI4th)— attorney's motion to withdraw to become witness—other witnesses available—motion properly denied**

The trial court did not err in denying defendant's motion to allow her attorney to withdraw and testify with respect to his statements to defendant regarding the substance of the State's case where defendant argued that her attorney's testimony was necessary to discredit a witness's testimony by showing that defendant's statements to the witness were actually defendant's attempt to explain the State's theory of the case which had been told to her by her lawyer, but the trial court determined that other witnesses were available to present the evidence being tendered by defense counsel.

**Am Jur 2d, Witnesses §§ 97, 98.5.**

**Defense attorney as witness for his client in state criminal case. 52 ALR3d 887.**

4. **Criminal Law §§ 1079, 1091 (NCI4th)— presumptive sentences imposed—no mitigating factors considered—consecutive sentences—no error**

Since the trial judge imposed the presumptive sentence for both armed robbery and second degree murder convictions, he was not required to consider either aggravating or mitigating factors, and it was within his discretion to determine that the sentences should run consecutively.

**Am Jur 2d, Criminal Law §§ 598, 599.**

APPEAL by defendant from *Sitton (Claude S.), Judge.* Judgment entered 15 October 1990 in Superior Court, CALDWELL County. Heard in the Court of Appeals 17 February 1992.

Defendant was charged in a proper bill of indictment with the armed robbery and murder of her grandfather, Theeman

Winebarger. The evidence presented tends to show that on 31 August 1989, 65 year old Theeman Winebarger was found by his son lying on the kitchen floor of his house on Blue Creek Road in rural Caldwell County. The son testified that his father was tossing and turning on the floor and that the kitchen was in disarray with broken glass and canned goods on the floor. The son also testified that his father's wallet could not be found on either the victim's person or in the house.

The victim was transported to Caldwell Memorial Hospital where he was found to have suffered a head injury. He was thereafter transferred to Frye Regional Medical Center where he died later the same day.

An autopsy of Winebarger's body showed extensive bruises and cuts as well as a skull fracture. The pathologist who performed the autopsy testified that the cause of Winebarger's death was trauma caused by a blow to the head "inflicted by someone with great force."

Police officers who investigated Winebarger's home testified that a woman's knit top was found lying on the kitchen floor and that several cigarette butts were found in an ashtray on the kitchen table. Blood and feces stains were found throughout the kitchen.

Defendant Karen Hart, the victim's granddaughter, was 25 years old in August 1989. Defendant was married and is the mother of two children. Karen had been separated from her husband for several months and she and the children were residing with her mother, Barbara Minton. During the summer of 1989, defendant also lived with Jerry Whittington on an intermittent basis. Whittington, along with John Hart, Dawn Dula and Teresa Walker, was involved in a check forging and uttering scheme and that group had also committed several other crimes together that summer. By the middle of August 1989, arrest warrants had been issued against Whittington arising out of the check offenses.

John Hart testified that he, Whittington, Dawn Dula and Teresa Walker had discussed robbing an old man on Blue Creek Road on six or eight occasions between July and August 1989. Defendant was present during more than one of those conversations. Hart testified that, on one occasion in July 1989, he, Whittington and defendant had driven to Blue Creek Road together and that defendant had pointed out Winebarger's house. Karen told Hart that

the man living in the house was her grandfather and that he kept a large amount of money in the house in a brown paper bag. Hart further stated that defendant said that she was going to visit Winebarger and could find out more about the money at that time.

After her arrest on 15 September 1989, defendant gave a statement to the investigating officers who testified at trial. According to Karen's statement to those officers, Whittington's sister, Diane Reynolds, received a note from Whittington on 28 August 1989, directing her to drive Karen to a secluded spot where he was hiding to avoid arrest. Ms. Reynolds drove Karen to the meeting place which Karen described as being four miles into the woods. Defendant stayed with Whittington after he assured her that he would arrange a way home for her the following day.

Karen stated that Whittington refused to allow her to leave the following day. On 30 August 1989, she wanted to go to Winebarger's house in order to pick vegetables from his garden. Defendant and Whittington arrived at her grandfather's house at about 5:00 p.m. that evening. She spoke with Winebarger and then went to the garden while Whittington went into the house with Winebarger.

According to defendant, she picked vegetables from the garden, went into the house where she changed the shirt she was wearing because it became muddy in the garden, and then sat down at the kitchen table with her grandfather. Whittington then claimed to have a headache and went outside allegedly to find headache medicine in the truck. When he came back into the kitchen, Whittington had a baseball bat. Karen stated that she then became frightened and that Whittington started hitting Winebarger with the bat. She jumped up from the table and attempted to leave the house but found that the doors were locked. As she ran through the house trying to find a way out, she heard Whittington repeatedly hitting Winebarger.

Karen later went back into the kitchen where she saw Whittington looking through Winebarger's pockets as he lay on the floor. Whittington and defendant then left the house and drove toward Interstate 20. Once in the truck, Karen saw Whittington put Winebarger's wallet on the dash.

Karen stated that she and Whittington traveled south on Interstate 20 to Talledega, Alabama where they stayed for approximately one week. They then traveled to Atlanta where they stayed for several days before driving to Inman, South Carolina. Defendant claimed that throughout this travel, Whittington forced her to stay with him and that she constantly feared he would injure her.

Defendant telephoned her sister Gina on 14 September 1989 from Inman, South Carolina. Karen told Gina to alert authorities that Whittington was coming to Caldwell County the next day at a particular time and place in order to rob a convenience store. Gina did alert authorities and on 15 September 1989, Whittington and Karen appeared at the Cotton Smith convenience store in Caldwell County. Sheriff's deputies testified that when Whittington walked into the store, defendant immediately slid under the wheel of the vehicle and drove off. Karen drove to her mother's house where officers arrested her and transported her to the Caldwell County Jail. Meanwhile, Whittington was killed by officers while he was attempting to rob the store.

The State further presented the testimony of Sharon Logan who had shared a jail cell with defendant following her incarceration at the Caldwell County Jail. Logan testified that Karen had told her on various occasions about the events of 30 August 1989 which led to the death of Winebarger.

Logan testified that defendant told her that she had distracted her grandfather by showing him her breasts while Whittington came from behind and hit Winebarger with the bat. Karen also stated, according to Logan, that she only meant to rob her grandfather and did not mean to kill him. Defendant also told Logan that she tried to run when Whittington began hitting Winebarger and that she was afraid of Whittington.

Defendant was found guilty of armed robbery and second degree murder and sentenced to fourteen years imprisonment for the armed robbery and fifteen years for the second degree murder. The judge ordered that the sentences be served consecutively.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General G. Lawrence Reeves, Jr., for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Daniel R. Pollitt, for defendant, appellant.*

HEDRICK, Chief Judge.

[1] Defendant assigns error to the denial of her motions to dismiss and argues that the evidence 'is insufficient to raise an inference that she committed either offense charged or that she "acted in concert" with Whittington to commit either offense.

It is well settled in this State that a defendant may be convicted of a crime if she is present at the scene of the crime and the evidence is sufficient to show she is acting together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime. *State v. Giles*, 83 N.C. App. 487, 490, 350 S.E.2d 868, 870 (1986), *disc. review denied*, 319 N.C. 460, 356 S.E.2d 8 (1987); *State v. Joyner*, 297 N.C. 349, 357, 255 S.E.2d 390, 395-96 (1979). Further, "if two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose." *State v. Westbrook*, 279 N.C. 18, 41, 181 S.E.2d 572, 586 (1971), *death penalty vacated*, 408 U.S. 939, 33 L.Ed.2d 761 (1972). *See State v. Oliver*, 302 N.C. 28, 55, 274 S.E.2d 183, 200 (1981); *State v. Joyner*, 297 N.C. at 357-58, 255 S.E.2d at 395-96.

The evidence in the present case, when considered in the light most favorable to the State, is sufficient to permit the jury to find that defendant and Whittington, pursuant to a common plan and scheme to rob defendant's grandfather, went to Winebarger's home, and while defendant sat at the kitchen table exposing her breasts in order "to distract him," Whittington obtained a baseball bat with which he "began to beat" Winebarger, knocking him to the floor, and that Whittington took the victim's wallet, that Whittington and defendant then left Winebarger's residence and left the State. We hold that these facts, when found by the jury, are sufficient to support the verdict that defendant was guilty of the armed robbery and second degree murder of her grandfather.

Defendant cites *State v. Reese*, 319 N.C. 110, 353 S.E.2d 352 (1987) in support of the proposition that one who is alleged to have acted in concert with a perpetrator is guilty as a principal only if the requisite *mens rea* is shown as to each defendant. In *Reese*, the court was discussing the specific intent, *mens rea*, required for a conviction of First Degree Murder and the applicability of G.S. 14-17, the "felony murder rule," to a finding of specific

intent. Thus *Reese* has no application to the present case and defendant's assignment of error has no merit.

[2] Defendant next argues that the trial court erred by not allowing defense witnesses Brenda Minton and Judith Heskett to testify that defendant "was not acting in concert with Whittington." Defendant offered the testimony of Heskett, defendant's stepmother, that Karen told her on 14 September 1989 that she "couldn't get away from Whittington," that Whittington "had already beat her up [and] busted her mouth," that Whittington "had guns, was doing terrible things, and had threatened to kill her mother and children if she tried anything else." Minton, defendant's mother, testified that Karen told her on 15 September 1989, that Whittington "tried to kill her," that Whittington "held the gun on her all the way up there," that she "didn't think [she'd] make it here," that Whittington "wouldn't let her go," that she tried to leave "but he wouldn't let me go," and that she "wanted to take out warrants for Whittington for assault and kidnapping." Upon objection and motion to strike, the trial court instructed the jury not to consider Minton's testimony.

There is no merit in defendant's contention that this testimony was relevant to the determination of whether defendant was "acting in concert" with Whittington on the date of the offenses for which she was convicted. Karen spoke to Heskett over the telephone on 14 September 1989 and to Minton on 15 September 1989. Both conversations detailed events following Winebarger's murder. Evidence having no tendency to prove a fact at issue in the case is not relevant and is properly excluded. G.S. 8C-1, Rules 401 and 402 (1983). We find no error in the exclusion of either Minton's or Heskett's testimony.

[3] Defendant further contends that the trial court erred in denying the motion to allow her attorney to withdraw and testify with respect to his statements to defendant regarding the substance of the State's case. Defendant argues that her attorney's testimony was necessary to discredit Logan's testimony by showing that defendant's statements to Logan were actually Karen's attempt to explain the State's theory of the case which had been told to her by her lawyer.

A motion to allow an attorney to withdraw his representation of a criminal defendant is addressed to the discretion of the trial judge. *State v. McGee*, 60 N.C. App. 658, 299 S.E.2d 796 (1983).

Such a ruling will not be disturbed absent an abuse of discretion. *State v. Locklear*, 322 N.C. 349, 356, 368 S.E.2d 377, 381 (1988). The trial judge conducted extensive *voir dire* and determined that other witnesses were available to present the evidence being tendered by defense counsel. There is no showing of discretionary abuse.

Defendant next argues that she is entitled to a new trial due to the trial court's erroneous admission of certain statements by S.B.I. Agent Brown and S.B.I. Agent Stubbs. These statements were offered by the State to corroborate the testimony of Sheila Bentley and Sharon Logan. Defendant now contends that the admission of these statements was improper as the statements were inconsistent with the trial testimony of Bentley and Logan.

There was no motion made by defendant at trial to strike those particular portions of testimony by Brown and Stubbs. Defendant was required to object and move to strike those portions of the statements which she felt did not corroborate previous testimony. *State v. Warren*, 289 N.C. 551, 223 S.E.2d 317 (1976); *Gibson v. Whitton*, 239 N.C. 11, 79 S.E.2d 196 (1953). This she failed to do and her contentions herein therefore have no merit.

[4] Finally, defendant argues that she is entitled to a new sentencing hearing because the trial court abused its discretion in ordering the presumptive sentence in both cases and in ordering that the two terms run consecutively. Defendant contends that the court abused its discretion by failing to find mitigating factors despite substantial uncontradicted evidence of such factors.

It is clear that, since the trial judge imposed the presumptive sentence for both the armed robbery and the second degree murder convictions, he was not required to consider either aggravating or mitigating factors. G.S. 15A-1340.4(b). *See State v. Horne*, 59 N.C. App. 576, 297 S.E.2d 788 (1982) and *State v. Cain*, 79 N.C. App. 35, 338 S.E.2d 898, *disc. review denied*, 316 N.C. 380, 342 S.E.2d 899 (1986). A decision to impose a presumptive sentence, as well as a decision that two or more terms should be served consecutively, is left to the trial court's discretion. *State v. Cain, supra, State v. Harper*, 96 N.C. App. 36, 384 S.E.2d 297 (1989). *See* G.S. 15A-1354(a). The defendant has not shown any indication of abuse of that discretion.

Affirmed.

Judges ORR and WALKER concur.